**Diane DEWILDE, Plaintiff,**

v.

**GUY GANNETT PUBLISHING CO., et al., Defendants.**

**Civ. No. 91–375 P–C.**

United States District Court, D. Maine.

July 1, 1992.

---

Richard Slosberg, Portland, Me., for plaintiff.

Geoffrey K. Cummings, Preti, Flaherty, Beliveau & Pachios, Portland, Me., for defendants.

GENE CARTER, Chief Judge.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this five count action, Plaintiff seeks relief for alleged sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Maine Human Rights Act, 5 M.R.S.A. § 4572, and for breach of contract, and intentional and negligent infliction of emotional distress under the common law of Maine. Defendant has filed a motion for summary judgment on all counts. Plaintiff has failed to file a timely objection to the motion as required by Local Rule 19(c).[1]

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

---

1. On June 16, Plaintiff filed and the Court denied a request for an extension of time in which to file a response to the motion for summary judgment. Plaintiff's response was due on June 22, 1992. On June 24, 1992, Plaintiff filed a response to the motion with accompanying memorandum, a statement of disputed and undisputed fact and an affidavit by Plaintiff. In addition to its lateness, the affidavit is unsigned and unnotarized.

An even more egregious example of bad practice on the part of Plaintiff's counsel is the late-filed memorandum of law in support of Plaintiff's response to the summary judgment motion. The memorandum plagiarizes Defendants' memorandum in significant part, copying the legal portions of it on all counts except for Count III virtually verbatim. On Count III Plaintiff's counsel has cited no legal authority.

Throughout the brief, Plaintiff's counsel has inserted his own facts and conclusions, contrary to those written by defense counsel, but it is clear that he did no legal research and remained content to let defense counsel do all the work. Defense counsel has graciously or perhaps inadvertently failed to call this major breach in professional conduct to the Court's attention. The Court, however, cannot let it pass without condemnation.

Plagiarism is unacceptable in any grammar school, college, or law school, and *even* in politics. It is wholly intolerable in the practice of law. The Court has obviously disregarded the memorandum submitted by Plaintiff's counsel, first for its untimely filing under Local Rule 19 and second, because it does not represent any additional contribution on the part of Plaintiff's counsel to the Court's understanding of the law.

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

*Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989).

It is well-established law in this district that Fed.R.Civ.P. 56 requires the Court to examine the merits of a motion for summary judgment even though a nonmoving party fails to object as required by Local Rule 19(c). *Gagne v. Carl Bauer Schraubenfabrick,* 595 F.Supp. 1081, 1084 (D.Me. 1984); *McDermott v. Lehman,* 594 F.Supp. 1315 (D.Me.1984). However, a party who fails to object to a motion for summary judgment within ten days, as is required by Local Rule 19(c), is deemed to have consented to the moving party's statement of facts to the extent it is supported by appropriate record citations. *Lehman,* 594 F.Supp. at 1321.

The facts as set forth in Defendants' statement of material facts are as follow. Plaintiff was hired by Defendant Guy Gannett Publishing Co., d/b/a WGME–TV, on April 24, 1989. The only documents setting forth the terms and conditions of her employment were a memo confirming her hiring and rate of pay, a job description for the Program/Operations Assistant position, and a WGME Employee handbook, which is a compilation of WGME–TV's policies and practices. The handbook, which was distributed in early 1991, represented no changes in policy or practice. It stated in its preface: "This handbook does not constitute an employment contract of any kind. All employees are employees-at-will unless provisions of personal services, IBEW or AFTRA contracts provide otherwise." Plaintiff was not covered by any union or personal services contract. She was not given any documents limiting Defendants' ability to terminate her at will, and no one ever discussed with her any limitation on Defendants' ability to terminate her.

Plaintiff worked in the Programming and Sales Departments of WGME–TV. In early 1991 she began reporting directly to Paul Saltin, the station's general sales manager. Plaintiff asked Saltin to consider her for an account executive position. Saltin refused to interview her for an account executive position. No such job was posted or advertised, and Plaintiff did not file any written application. Although an account executive for WGME–TV retired in May 1991, no funds were budgeted to replace him or to hire another account executive, and no one was hired to replace him or to fill any other account executive position.

In late April or early May, 1991, Neil Brody unsolicitedly sought a position as an account executive with WGME–TV. He requested that he be allowed to sell advertis-

ing to new accounts on a commission basis. On May 6, 1991, he was retained on that basis. After acknowledged failure, he resigned on August 3, 1991.

Through July 12, 1991, the WGME–TV sales department consisted of seven or eight account executives, four of whom were women. Throughout 1991, the number of women employed by WGME–TV exceeded the Federal Communications Commission/Equal Opportunity Employment Commission criteria for reasonable and appropriate numbers of women and minority employees.

Neither Defendant Stough nor Defendant Saltin intended to discriminate against Plaintiff because of her gender, and they did not intend to cause her any mental anguish or emotional distress or know of any conduct by them or any other WGME–TV employee which would have tended to have such effects. Plaintiff testified that she does not believe that Defendants Saltin and Stough or anybody at WGME–TV acted in a malicious fashion against her or intentionally wanted to cause her distress of any sort.

Saltin avers that Plaintiff was terminated from her employment on July 12, 1991, for unsatisfactory performance of her job duties as national and local sales assistant. A woman replaced Plaintiff in that position.

### Count I

Count I alleges that Defendants have violated Title VII by reducing Plaintiff's pay and changing her conditions of employment, failing to offer or assign her to open and available jobs, and discharging her all because of her gender. Title VII of the Civil Rights Act of 1964 provides in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

**2.** Although Plaintiff has not explicitly stated that hers is a disparate impact case, that type of sex discrimination claim is the only one even remotely suggested by the complaint and Plaintiff's deposition.

**3.** The Court realizes that Federal Rule of Civil Procedure 11 requires unsigned pleadings to be

(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1).

■ To prevail in a Title VII action alleging disparate treatment[2], Plaintiff must first prove a *prima facie* case, which the Supreme Court has described as "proof of actions taken by the employer from which discriminatory animus can be inferred because experience has proved that in the absence of any other explanation it is more likely than not those actions were based on impermissible considerations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 568, 98 S.Ct. 2943, 2945, 57 L.Ed.2d 957 (1978); *Fields v. Clark University*, 966 F.2d 49 (1st Cir.1992). In more specific terms, the Plaintiff must "prove that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Fields*, at 51.

■ The undisputed record shows that WGME–TV did not have available the position of account executive for which Plaintiff says she orally applied. Plaintiff admitted at her deposition that she was merely "under the impression" that Saltin wanted to hire two new entry-level account executives. Plaintiff's Dep. I, at 32. Her impression was formed from overhearing him on the telephone saying that he wanted two new account executives who would bring in new business. *Id.* at 42. In her late-filed, unexecuted and unnotarized affidavit,[3] Plaintiff, or Plaintiff's attorney, explained that

stricken, unless they are promptly signed after the deficiency is called to the attention of the pleader. Here the Court did not call the lack of signature to the attention of Plaintiff because the affidavit was untimely filed. As is made clear in the text, even if the affidavit were

In April of 1991 I heard him talking on the phone, that he was going to hire two entry-level account executives at $25,000 per year to start, until they had a stable account list. I felt I was well qualified for that position because I was an account executive in radio and I worked with account in traffic at WPXT–TV. I also needed the salary increase that the position offered and I felt ... seeking a better paying position was not unreasonable.

Defendant's undisputed material facts show that WGME–TV never listed or advertised an account executive position, and that no money was budgeted for new account executive positions. Also for budgetary reasons WGME–TV did not fill a vacancy created by a retiring account executive. Although the station did retain a person to sell advertising to new accounts, that person was not hired for the salaried position which Plaintiff assumed to exist. Rather, Neil Brody was allowed to attempt to sell advertising to new accounts on a commission basis.

Plaintiff has failed to produce any evidence that the position of account executive for which she informally applied existed. She has, therefore, failed adequately to prove her *prima facie* case of sex discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. As the Supreme Court said in *Celotex*:

> [T]he plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element to the non-moving party's case necessarily renders all other facts immaterial.

*Celotex v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

signed it merely demonstrates the emptiness of

■ Plaintiff also alleges that sex discrimination impermissibly motivated both changes in the conditions of her employment and her termination as well as Defendants' refusal to reinstate her. When asked at her deposition what the basis of her sex discrimination claim is, Plaintiff referred only to the above discussed incident when she was not allowed to interview for an account executive position, and Neil Brody was retained. Plaintiff's Dep. II, at 26. Interrogatory number 14 requested

> If you contend that Plaintiff was terminated, not offered another position, or not promoted by WGME–TV on account of her sex, please state in detail each and every fact of [*sic*] inference upon which you base that contentions [*sic*]. In addition, please identify each and every document that discusses or tends to support that contention.

Plaintiff again responded with a capsule description of the account executive incident. The last sentence of her reply might be construed as dealing with her other allegations. It said: "Thereafter, I was ignored and then terminated."

Defendant argues that there is no evidence in the record to support Plaintiff's claim of sex discrimination. As the Court of Appeals for the First Circuit has stated:

> In cases alleging discriminatory firing, plaintiffs initially have the burden of establishing a *prima facie* case of [sex] discrimination.... If this procedural bulwark is successfully surmounted, the gauntlet is then passed to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's dismissal.... If defendant is successful in doing so, the plaintiff is then charged with the responsibility of proving that defendant's stated reason is only a pretext concealing an underlying [sexually] discriminatory motivation.

*Morgan v. Massachusetts General Hospital*, 901 F.2d 186, 189 (1st Cir.1990) (citations omitted). Here Defendant's stated reason for discharging Plaintiff is intertwined with her *prima facie* case, for Defendants have submitted affidavits stating

her claim.

that they had no intent to discriminate against Plaintiff because of her sex and that she was terminated for poor job performance.[4] Proving Plaintiff was qualified is, of course, one of the elements of her *prima facie* case. *Oliver v. Digital Equipment Corp.,* 846 F.2d at 108. Assuming without deciding that Plaintiff has produced enough evidence to establish a *prima facie* case, the Court is satisfied that Defendants have met their burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's dismissal.

Moving on to the next step in the analysis, however, Plaintiff has made no effort to show that the reason for dismissal proffered by Defendants is a pretext for discrimination. She has offered no evidence which tends to show that her discharge was based on sex discrimination rather than on her poor performance. Even if Plaintiff's deposition testimony, if stretched to the very limit, might be construed as casting some doubt on whether she actually was qualified for the position or inadequately trained due to some failing of defendants, " 'evidence contesting the factual underpinnings of the reasons for the [employment decision] proffered by the employer is insufficient, without more, to present a jury question.' " *Morgan,* 901 F.2d at 191 (*quoting* lower court decision). There is no evidence in the record even minimally suggesting discrimination. Plaintiff has not offered any evidence that similarly situated male coworkers were treated differently than she was. *See, id.* Moreover, the record shows that when Plaintiff was terminated, she was replaced by a woman. *Cf. Schuler v. Polaroid Corp.,* 848 F.2d 276, 278 (1st Cir.1988) (finding for purposes of ADEA *prima facie* case that Plaintiff cannot show defendant failed to treat age neutrally or that younger persons were retained in the same position because he was not replaced by a younger person). Since Plaintiff has failed

in the first instance to establish a *prima facie* case that a position was available and in the second to make the required showing that Defendant's reason for firing her was a pretext for sex discrimination, summary judgment is appropriate for Defendants on Count I. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.[5]

### Count II

In Count II Plaintiff alleges that the same acts of Defendants which formed the basis for her claim in Count I also constitute sex discrimination in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4572(1), Maine's counterpart to the federal Civil Rights Act of 1964. That section provides:

1. UNLAWFUL EMPLOYMENT. It is unlawful employment discrimination in violation of this Act, except when based on a *bona fide* occupational qualification: to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, physical or mental disability, religion, age, ancestry or national origin, ... or, because of those reasons, to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment....

5 M.R.S.A. § 4572(1). In *Maine Human Rights Comm'n v. City of Auburn,* 408 A.2d 1253, 1261 (Me.1979), the Maine Law Court explained that it would look to federal case law to interpret the Maine act, and it specifically adopted the *prima facie* case rule set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and reaffirmed by the Court in *Burdine,* 450 U.S. at 253. Since Plaintiff has failed satisfactorily to produce

---

**4.** Included in Plaintiff's late submissions is a memorandum from Saltin detailing specific instances of Plaintiff's poor attitude and performance. With their reply memorandum Defendants have also submitted three supplemental affidavits elaborating on Plaintiff's failings as an employee.

**5.** The Court notes that although Plaintiff indicated in her answers to interrogatories that Defendants ignored her, the record is devoid of any evidence of sex discrimination in that behavior.

evidence on all the elements of her case under Title VII, summary judgment for Defendants is also mandated on the Maine Human Rights Act claim.

### Count III

In Count III, Plaintiff alleges that her termination by WGME–TV breached her employment contract under Maine law. Defendant argues that Plaintiff, as an employee at will, was rightfully terminated. "Under Maine law, 'a contract of employment for an *in*definite length of time is terminable at will by either party,' *Terrio v. Millinocket Community Hospital*, 379 A.2d 135, 137 (Me.1977), unless the parties clearly state their intention in express terms that a discharge shall be only for good cause. *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 99–100 (Me. 1984)." *Broussard v. Caci, Inc.–Federal*, 780 F.2d 162, 163 (1st Cir.1986).

Plaintiff has come forward with no evidence showing that she was anything other than an employee at will. When asked to produce the documents evidencing her contract with Defendants upon which her claim is based, she produced a memo saying that she had been hired as programming department assistant at a rate of $308 per week, with a ninety day trial period. This memo included a job description listing the tasks which a program/operations assistant was expected to perform. Plaintiff also produced an employee handbook, distributed in early 1991, detailing WGME–TV's policies. The handbook, which reflected prior policies as well, contained a section entitled "Termination." That section listed misconduct that might be cause for discipline or dismissal. The booklet stated explicitly that the examples "are not exclusive reasons for possible disciplinary action and/or termination." Moreover, in its preface the booklet stated: "This handbook does not constitute an employment contract of any kind. All employees are employees-at-will unless provisions in personal services, IBEW or AFTRA contracts provide otherwise." Plaintiff was not covered by any union or personal services contract. None of the documents on which Plaintiff relies as a basis for her breach of contract claim clearly limit in any way WGME–TV's ability to terminate her at will. *See Libby v. Calais Regional Hospital*, 554 A.2d 1181, 1183 (Me.1989).

Plaintiff also alleges that some of the terms of her employment contract were set forth in oral agreements. When asked at her deposition what was said to her regarding job security at the time she was hired, Plaintiff responded:

> At my interview I was told that the company liked to promote their employees, that most of the employees had been there for quite a number of years, which to me says a lot about a company; and I was given the impression that it is a place where you could move up.
>
> . . . . .
>
> Termination was never discussed.

Plaintiff's Dep. I, at 24. Plaintiff also expressly admitted that she had been given no documents by her employers and had had no discussions with them indicating that she would be terminated only under certain circumstances. Plaintiff's Dep. II, at 52–53. As the Court said in *Libby v. Calais Regional Hospital*, 554 A.2d at 1183: "[Plaintiff] did not present any evidence of an express restriction on [defendant's] common law right to discharge her at will, and her employment contract for an indefinite time remained terminable at will. No jury verdict for the Plaintiff could be sustained." Summary judgment is, therefore, appropriate for Defendants on Count III. *Brennan v. Hendrigan*, 888 F.2d at 191 (*citing Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11).

### Count IV

In Count IV Plaintiff seeks relief for intentional infliction of emotional distress. Specifically, she alleges that Defendants conduct toward her "was and continues to be intentional, unusual, outrageous and extreme and has inflicted on and caused DeWilde severe mental anguish and emotional distress."

The Maine Law Court has recently reaffirmed the factual elements of the tort of

intentional infliction of emotional distress as:

> (1) intentional or reckless conduct which inflicts severe emotional suffering or would be substantially certain to result in such suffering; (2) conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable; (3) the defendant's conduct must cause the plaintiff emotional suffering; and (4) the plaintiff's emotional suffering must be severe so that no reasonable person could be expected to endure it.

*Latremore v. Latremore*, 584 A.2d 626, 631 (Me.1990) (*citing Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1965)).

Defendants argue that there is no evidence in the record to support a finding that the first factual requirement is met. That is plainly correct. Both Defendant Stough and Defendant Saltin awkwardly aver that they are "aware of no intentional, willful, reckless or malicious conduct by [themselves] or by any other employee of the station ... intended to cause [Plaintiff] any mental anguish or emotional effects or that would tend to have such effects." This averral is deemed undisputed because of Plaintiff's failure to respond to the motion for summary judgment in a timely fashion, and the Court finds nothing elsewhere in the record to generate a genuine issue of material fact as to what Stough and Saltin intended or knew. In fact, when asked at her deposition whether she believed that anyone intentionally wanted to cause her distress of any sort, Plaintiff unequivocally answered "no." Plaintiff's Dep. II, at 56.

The Court notes, too, that the record is devoid of any indication of conduct by any of the defendants which could be described as "so extreme and outrageous as to ex-

ceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable." *See Latremore v. Latremore*, 584 A.2d at 631. Plaintiff suggests that she was fired by Defendants and seems to bemoan the fact that they "ignored" her prior to her termination. Plaintiff's Dep. II, at 60. This is not extreme and outrageous conduct exceeding all possible bounds of decency.

Since Defendants have adumbrated an absence of evidence concerning important factual elements of Plaintiff's claim of intentional infliction of emotional distress, and Plaintiff has failed to generate a genuine issue as to the existence of those facts, summary judgment must be granted for Plaintiff on Count IV.

### Count V

Finally, Plaintiff has alleged negligent infliction of severe emotional distress. Defendant argues that the record will not support a finding that Plaintiff's emotional distress was severe. In a recent case dealing with negligent infliction of severe emotional distress, the Maine Law Court stated: "For a definition of 'severe emotional distress' see Alexander, *Maine Jury Instruction Manual* 7–32." *Fuller v. Central Maine Power Co.*, 598 A.2d 457, 460 n. 2 (Me.1991).[6] Judge Alexander sets forth the following definition:

> The term "severe emotional distress" means something more than minor psychic and emotional shocks, something more than the usual and insignificant emotional traumas of daily life in modern society. Severe emotional distress means emotional distress created by the circumstances of the event that no reasonable person could be expected to endure.

---

**6.** In *Fuller* the plaintiff had argued that she was entitled to an instruction defining emotional distress without reference to its severity. The Law Court rejected the argument since the plaintiff had alleged, as plaintiff did here, that she suffered from severe emotional distress. *Fuller*, 598 A.2d at 459. Stating "[w]e have never held that liability can be imposed upon a defendant for the negligent infliction of emo-

tional distress of some degree less than severe," *id.*, the court did not fully reject the possibility that in some circumstance recovery for negligent infliction of emotional distress might be available with a showing of distress that is less than severe. It made clear, however, that such a claim was not available when Plaintiff had alleged severe emotional distress and had tried the case on that basis.

■ The record here contains no evidence of severe emotional distress. When asked to describe her mental condition following her termination, Plaintiff responded: "Well, I was a little depressed, not at first, because I had the summer, I was a little bit depressed about the job situation, it seemed so bleak.... [B]ut I don't really think that I was real depressed, I mean, just a little down." Plaintiff's Dep. II, at 49–50. Plaintiff also responded in the negative when asked if she had experienced extreme emotions as a result of the termination. *Id.* at 50. She also stated that she felt she handled the situation "good" emotionally because she is a very strong person. *Id.* at 55. Plaintiff later said she tried to take the termination "as best I could, and emotionally, it was not easy, ... it's extremely difficult to try to find a job under the circumstances of high unemployment, your benefits are cut, you can't take your kids to the doctor's." *Id.* at 58. Although Plaintiff had previously said she was "a little happy" when she was terminated and not depressed, *Id.*, at 32, she modified the statement later saying "when I say I was out having fun, it's not true.... [Y]ou take ... what life gives you, and try to work it out as best you can, but I am a human being, and I was distraught emotionally." *Id.* at 58–59. She characterized feeling distraught as feeling powerless because things were beyond her control financially and she was concerned about paying the bills. *Id.* at 60. Plaintiff agreed that this emotional distress was caused by her termination. *Id.* at 60.

Certainly, the emotional distress described by Plaintiff is nothing more than "the usual and insignificant emotional trauma of daily life in modern society." Alexander, *Maine Jury Instruction Manual* 7–32. Clearly, most persons whose jobs are terminated feel powerless and worry about finances as Plaintiff did. Obviously, however, a cause of action for negligent infliction of emotional distress is not available to all persons whose employment has been terminated. Plaintiff has not shown any

particular circumstances of her firing that "no reasonable person could be expected to endure." *Id.*

When asked whether anything other than the termination had caused her problems, Plaintiff responded that her employers had ignored her "pretending that I was invisible for those few months prior to my termination." *Id.* at 60. Plaintiff described this "getting no response" as "almost as worse as being pounded on every day. That in itself caused me not to sleep at night.... I was wondering what the heck is going on here, this is supposed to be a place of business. That caused me distress." *Id.* Reasonable people can be expected to, and do, in the course of performing their jobs, endure lack of attentiveness and unresponsiveness in their superiors. Again, neither the circumstances described by Plaintiff nor her response to them even arguably reach the level of severity required to prove negligent infliction of severe emotional distress.[7] Since Plaintiff has failed to make a showing sufficient to establish the existence of severe emotional distress, an element essential to her case, and on which she will bear the burden of proof at trial, summary judgment against her is mandated by Rule 56(c). *Celotex v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### Attorney's Fees

■ Defendants here seek attorney's fees on the grounds that Plaintiff's Complain is frivolous. Title VII provides for attorney's fees for the prevailing party, but in order to best effect the purposes of the statute, courts should refrain from liberally awarding them to a prevailing defendant. *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978); *Broussard v. CACI, Inc.–Federal*, 629 F.Supp. 413 (D.Me.1986). Attorney's fees are available to prevailing defendants, however, when the suit is frivolous, unreasonable or without foundation.

---

**7.** The Court notes that none of the other aspects of her treatment of which Plaintiff complains, *e.g.*, the employer's failure to let her interview

for a position and failure to train her, are "circumstances that no reasonable person could be expected to endure."

*Id.* Here the circumstances are so egregious that such an award is fully merited.

As discussed above, Plaintiff had no evidence to support her claims of gender discrimination and could not make out a *prima facie* case. Although Plaintiff pointed to the fact that a man was hired as an account executive, there was no such position available. Moreover, had the position existed, there were virtually equal numbers of men and women account executives, and Plaintiff pointed to no circumstances indicating that gender was an issue. WGME–TV was in compliance with federal guidelines concerning equal employment opportunity. Finally, when Plaintiff was terminated, she was replaced by a woman. Plaintiff, at her deposition, professed not to know about the law of sex discrimination. Her attorney, however, is charged with such knowledge, and he bears the responsibility for pressing this groundless suit.

Federal Rule of Civil Procedure 11 provides that signature of a pleading by an attorney constitutes a certificate that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law...." If a pleading is signed in violation of this rule, the court may impose an appropriate sanction which may include the costs incurred by the filing of the pleading, including a reasonable attorney's fee. Fed.R.Civ.P. 11.

Reasonable inquiry by defense counsel at Plaintiff's deposition ascertained very quickly that her state law claims for emotional distress and breach of contract had no basis. Plaintiff's counsel was required by Rule 11 to conduct such a basic inquiry himself before filing the claim. Attorney's fees, charged against Plaintiff's counsel, are, therefore, in order for these pendent state claims as well.

Finally, the Court notes that this is a particularly fitting case for an award of attorney's fees charged against Plaintiff's attorney. Since Plaintiff's counsel appropriated the work of defense counsel, submitting it as his own, he should, at the very least, pay for the services unwittingly rendered.

Accordingly, it is *ORDERED* that Defendants' motion for summary judgment be, and it is hereby, *GRANTED* on all counts of the complaint. Defendants are hereby *ORDERED* to submit within 10 days of the date of this order an accounting showing their *reasonable* attorney's fee and expenses for having to defend against this frivolous suit. *See Fleet Bank of Maine v. Steeves*, 793 F.Supp. 18 (D.Me.1992). Plaintiff's *counsel* will pay to Defendants their costs and attorney's fees generated by this litigation after the Court has approved the above-mentioned accounting.

SO ORDERED.